## Case No. 12,526a.

SCOTT et al. v. The CLARA E. BERGEN.[1]

District Court, D. South Carolina. June 23, 1882.

ADMIRALTY — SALVAGE — AMOUNT — BASIS OF ALLOWANCE.

[1. The schooner B., loaded with a cargo of iron rails, ran hard aground on a sand bar on the side of a narrow channel near the entrance to Charleston Harbor, at nearly high tide. She lay in a position of actual danger, which was likely to be very greatly increased by the sudden changes of wind and weather to which the locality was subject, and the state of the tide allowed a very short time for getting her off before the ebb. The steamer P. and a tug, seeing the situation of the B., went promptly to her assistance, and, by their combined efforts,— the aid of both being necessary, in order to exert force in the proper direction,—pulled the B. off the shoal without material injury. The steamer and tug incurred some risk, but not much. The time occupied was about an hour. The value of the B. and cargo was $38,000; and of the steamer and her cargo, and the tug, $44,000. *Held*, that $1,200 was a proper compensation for the salvage service rendered by the steamer and tug.]

[2. Allowances for salvage services, being dependent wholly on success, and the encouragement of such services being of high importance to commerce, are based, not on the principle of quantum meruit, but on the benefit conferred on the owners of the salved property, and should be awarded with such liberality as to give a proper encouragement to their rendition.]

[This was a libel for salvage by Dominick Boyle, master of the steam tug Jacob Brandow, for himself and owners, officers, etc., of the tug, and Richard Scott, master of the steamer Planter, for himself and owners, officers, etc., of the steamer, against the schooner Clara E. Bergen and cargo.]

A. J. Magrath, for libelants.

A. T. Smythe, for The Clara E. Bergen.

Brawley & Barnwell, for cargo.

BRYAN, District Judge. There is no question in this case that a salvage service has been rendered. The only question is one of degree, and the measure of compensation. In the apt language of Judge Lowell, where the vessel (as in this case) "is in actual or apparent danger, or her position or condition is such that she may probably soon be in danger, and the master acts, and permits others to act, upon that supposition, it would require a strong case of mistake on his part to reduce the service to something less than a salvage service." The M. B. Stetson [Case No. 9,363]. A vessel on shore, on a sand bar, at the mouth of any one of our harbors on this coast, whatever the weather at the time of getting aground, is in a position of intrinsic danger,— if not at the very time, probably soon will be. The position is one of danger, essentially. But the schooner in this case, from the circumstances when she went ashore, the time of the tide, and the strength and direction of the wind, made her condition one of actual danger, and exposed to even greater and uncertain danger. She was driven ashore with all sails set, with a full spread of canvass, under a fairly fresh breeze, and with a cargo of iron, which gave the greatest momentum to her progress and aggression on the shore; and, to make the matter the worst possible for her, she took the ground nearly at top of the tide, and was under the pressure of nearly all her sails, till high water, carrying her still farther on the shore.

Under these circumstances, the time for a successful relief to her was limited, if she was to be pulled off without loss of any portion of her cargo. The delay of an hour or more would have rendered any attempt hopeless. The opportunity unimproved would have compelled a delay of 12 hours, or waiting till the coming round of another high tide, at midnight, and exposure to all the chances involved in such delay. Another controlling element, resulting from her position and the inevitable action of tide and wind, was that no one vessel could possibly have relieved her, for no one vessel could have been held up or kept in position, which was absolutely necessary for a straight pull, or direct application of force. One vessel, tug or steamer, would have been swept out of line by wind and tide, and her force spent in an oblique direction, and to no good purpose, if not positively harmful. How hard she was aground, and the difficulty of her extrication under the best possible conditions, are manifested by the history of the attempts to relieve her. At high water the first effort at relief was made by a small tug, of large power for her size,—the Royal Arch. It ended in a failure, and the parting of her hawser; she could not hold up. In the second and successful effort, made by the libelant, the hawser of the schooner was parted, as also the hawser of the tug Brandow. The schooner was most fortunate in her rescue; the two vessels coming together almost at the same time, and such time of tide as to render their combined forces properly effective, and in fact successful. They arrived half an hour after the ebb tide set in, and sooner than any aid could have been supplied by means of any message sent to the city by the captain of the schooner.

The captain, in his testimony, stated that he depended upon a tug and lighterage, if he did not get off at high tide. He did not get off at high water, and, as has been seen, could not have been taken off by any one vessel. The tug Morgan (Charles F. Hard, master), which, it appears in evidence, went down in the afternoon, could have done nothing of herself, and additional aid could not have been procured, of tug or steamer, under an hour or more, especially if a flat was to have accompanied the additional tug for the purpose of lighterage. I think it will be conceded, in the light of what did happen when, at the first moment, the efforts were made to get her off, that, after the falling of the tide for an hour, no force that could have been put upon the schooner could have taken her off,

[1] [Not previously reported.]

and no hawser could have borne the strain necessary to move her. Lighterage then, or jettison of the cargo, would have been the only remedies; and upon this last, if need be, the captain was resolved (such was his sense of the danger of his position), if he had to throw over all his cargo to relieve his vessel. But, conceding that the process of lighterage could have been resorted to, yet it would have been resorted to, necessarily, under untoward circumstances. Whilst the vessel was being lightened, and the tide at the same time was falling, the two processes were going on together; and it is not easy to say what portion of the cargo would have to be thrown overboard, or removed to the lighter, before the vessel could have been relieved, even with the combined power of two vessels. From injury to the vessel by strain and thumping attending on delay (if nothing worse), and from the loss, not easily measured, by the process of jettison, and the cost of lighterage, if that process were practicable, the schooner and her cargo were happily relieved, without appreciable loss or damage, by the timely and effective interposition of the steamer Planter and the tug Jacob Brandow, the libelants in this case.

We have seen that the Bergen was aground, and in a dangerous position. Was the salving service rendered to her without danger to them? A landsman might think so, if not positively instructed by facts, and the demonstration of experience. If the pulling off a vessel from a shoal on the side of a narrow channel, where she was hard aground (which is salvage), could be confounded with simple towage, then there would be no appreciable danger. Towage has to deal only with water,—its head winds, calms, tides, and currents. These are all, ordinarily, yielding elements. They offer no sharp, peremptory, abrupt resistance. The tenacious grip of the ground is in contrast with the soft clasp of the watery element,— its loose embrace and slippery hold. To confound the two involves a confusion of ideas, an abuse of language, and a denial of justice. They are different in essence, incidents, and consequences, as in the principles that govern them, as set forth and sanctioned by the authority of the books, in decided cases, in unbroken succession. In no case stronger than in this could the difference between them have been more forcibly and strikingly illustrated. No less than three hawsers were snapped in the attempt to loosen the hold of the schooner on the land. Any one of these hawsers would have towed this vessel, or one twice her size, if afloat, from the bar to the city, without danger or difficulty. This is done every day in the year. But this sudden snapping of hawsers (not to be foreseen or provided against) involves the danger of their entanglement in the wheels or screw of the salving steamer or tug, and when more than one tug or steamer are employed in the salvage, may lead to collisions, which no forecast can anticipate, or

skill guard against. This is a danger inseparable from such service, and cannot properly be ignored when the dangers to the salving service are to be taken into account, and the measure of compensation to be passed upon. A retrospect of the cases tried in this forum for many years past will abundantly confirm this statement, and enforce this view. There was no danger to the salving steamer and tug, in the performance of their work, from lack of water. They could operate with entire safety and freedom from all apprehension of taking bottom. The only possible, if not probable, danger, to the steamer and tug, arose out of the narrowness of the channel (swash channel), and the proximity of the shoal upon which the schooner lay to the jetties, and upon the revulsion upon parting of hawsers, being thrown upon the jetties. Whilst this danger, in the range of contingencies, could not be regarded as wholly imaginary, and not to be considered, yet it is rather remote to carry much weight with it.

It must ever be borne in mind that the salvor depends wholly, for any compensation, upon success. If he fail,—never mind what his enterprise, labors, sacrifices, damage to property, or injury to person,—he can get nothing. All attempts, however costly, meritorious, or praiseworthy, go for nothing. In the event of failure, he has to make his own repairs and pocket all losses, and he must give before he can get. He must save before he can ask to share what is saved. The owner, in fact and in law, can only be called upon to give to the salvor a portion of that very property which the salvor has saved for him; to restore only a portion of that which, but for the salvor, would have been lost to him. Thus it is the salvor who enables the owner to make the payment. And it must ever be remembered, also,—never mind what the injury to the salvor, in person or property; it may be double or treble of the property saved,—he can only be remunerated so far as the property saved can remunerate him. He has no personal claim against the owners. His only means of payment is the property saved. And such is the appreciation of the services of the salvor, and benefit conferred upon the owner of the property saved, that the law regards the property saved as the property of the salvor, to the extent of the salvage service, mortgages it to the salvor, puts him in possession of it, and confirms and maintains his possession until the salvage is paid. It only restores the ship and cargo to the owners upon payment of the salvage, or ample security for the payment. The remuneration of the salvor, then, does not proceed chiefly (the opposite, rather) upon the principle of "pro opere et labore,",but upon the benefit conferred upon the owners. This will be more clearly apprehended, as it is most strikingly illustrated, in the case of derelict, or vessel abandoned at sea. The highest salvage

is given in case of a derelict, one-third to one-half being the general rule. The ship may have been abandoned in a gale, but it is not necessary that the salvors should have encountered a tempest, or hazarded life or property, in bringing the derelict into port. The foundation of this rule is, not that proceeding upon work and labor, but upon benefit conferred, and doing that necessary to be done to secure the benefit to the owners. Heroic effort, the hazard of life and property, may enhance the service, exalt its character, and increase the reward; but the remuneration, in general, is founded, and finds its justification, in the fact of benefit in the rescue and return to the owners of property which, but for the interposition of the salvors, might have perished in the sea. The remuneration that results from mere labor and work excludes all idea of danger to either party. Neither hazard to the property, or benefit conferred on the property, or danger to the person or property, of the person performing the work,—these elements do not enter into it and modify or measure the compensation. Towage belongs to this class. It ranks with drayage, or freight by sea or land; conveying a bale of cotton on a dray from the rail to the wharf, or a box of goods on the railroad to Augusta or Columbia. The only thing paid for is conveyance,—the transportation from one point to another,—without any reference to danger of person or property to either party. Such is the ordinary service, "pro opere et labore," of the towage of a vessel over the bar from our wharves, or the towage of a vessel (to save a tide in a calm or head wind) from over the bar to our wharves.

At the risk of being tedious, and the fact of being somewhat episodical, I have thought it necessary to dilate upon the distinction, between services which depend for their compensation upon the rule of merit for work and labor done, and salvage services proper, which demand a return or reward based upon very different principles and considerations. I do so because I think it not a little necessary, and in full accord and hearty sympathy with the timely, earnest, cogent, and enlightened remarks of Mr. Justice Hughes, of Virginia, expressed in the recent, very important case of The Sandringham, as reported in the March number of the Federal Reporter (pages 572, 573) for the year 1882 [volume 10]. The judge says: "It may be laid down as a cardinal principle of salvage that the rule of compensation to be allowed in any case must not only contemplate the labor and exertion and danger attending the particular enterprise, but must be so liberal, if the condition of the fund at disposal permit, as to attract public attention; the court looking not merely to the exact quantum of service performed, and its actual value, but to the general interests of navigation and commerce, which depend for protection upon services of this character. I have emphasized the latter feature of the policy of the law of salvage, because there is a growing complaint, among wreckers and salvors, that the admiralty courts of our Atlantic coast—more particularly, those of New York—have, until quite recently, been disposed, for a long time, to ignore it, in their awards of salvage, and to confine themselves too much to the quantum meruit view of the value of salvage services. Whether the policy of the courts has been too restricted, or not, in this respect, it is not for me to say; but the fact is, whether resulting from this or other causes, that almost every wrecking company which has operated along the Atlantic seaboard for the last fifty years has ceased to exist. In this country we have no legislation having for its object the encouragement of salvors, like the merchants' shipping act of Great Britain (17 & 18 Vict. c. 4, §§ 458 et seq.), and the duty of affording this encouragement devolves upon the admiralty courts; and I think it is generally contended that unless these courts are more liberal in their awards of salvage than they were for a considerable period, until recently, the business of wrecking, as an organized pursuit, conducted by reputable men, will soon be wholly abandoned. Certainly, if it be the policy of the law and humanity for the courts to encourage, by liberal bounties, the rendering of aid to persons and property in peril at sea, that encouragement ought not to be doled out so illiberally, as to destroy all organized and reputable wrecking companies on our seaboard. I do not propose, in this case at bar, however, to make any violent departure from the policy of our American decisions. I think a more liberal policy has already been inaugurated in most of our courts, especially by the supreme court of the United States; its decisions in the case of The Comanche, 8 Wall. [75 U. S.] 448, and The Blackwall, 10 Wall. [77 U. S.] 1, being conspicuous pioneers in the line of a liberal policy. The recent cases in the English high court of admiralty of The Hebe, 4 Prob. Div. 217, and of The Craigs, 5 Prob. Div. 186, indicate a liberalized policy in England, also."

Let me add, in enforcement and development of these views, that it cannot be too often and emphatically repeated that commerce, the ship owner, the shipper, and the insurance companies, cannot afford to be stingy in their dealings with salvors. They cannot consult their best and permanent interests, and an enlightened selfishness, but by the uniform practice of a wise liberality, which is in fact but a just recognition of the services rendered to them. It should not be regarded, truly considered, as a bounty, but as the legitimate price and proper return for the benefit conferred. And such a return as will most certainly and inevitably secure and command the needed service, such as will stimulate enterprise, sharpen vigilance, intensify devotion, nerve the timid, provoke the selfish, appeal alike to all that is generous and sordid in human nature, most promptly and thoroughly, under all circumstances, to undertake and carry through

at whatever expenses of hardship, sacrifice, and exposure, the vital saving work.

But, to come directly to the case in hand. In the opening of this opinion, I have stated that the only question was one of measure and compensation. The nature of the service (salvage) is conceded.

Let me now state and consider in detail all the several elements which go to determine the degree of the salvage and measure the compensation.

1. The degree of danger from which the property was rescued. We have already seen the danger to the salved vessel; that she was in actual danger, and in a position of indefinite danger. She grounded, under the pressure of a high wind, with all sails set, nearly at top of tide, on a shoal on the western side of a narrow channel (swash), from 4 to 5 miles from Charleston. I have already in this case, as in several others, stated my opinion, from my own experience, and from facts known to our community generally, and especially to all engaged in commerce, how full of danger such a position is, how sudden the change of wind and weather, how treacherous every smiling appearance, and what disaster lurks in the hidden, masked vicissitudes of a few hours, or even an hour. To be surprised by a squall or thunder storm, coming almost without warning from land or sea, and thrashed on the sands of these shoals, reveal a danger to all men, and are especially known to and keenly appreciated by seamen, and by none more intelligently and deeply than by the captain of the schooner Bergen, in this case.

2. The value of the property saved was, schooner and cargo, in all $38,000,—schooner, $11,000; cargo, $27,000. The schooner was saved with but a very slight damage, the loss of a portion of her false keel. The damage to the cargo, which was of iron rails, there was none. It may be said, roundly, that the salvage of the vessel and cargo was complete.

3. The risk incurred by the salvors in the performance of their work is such as I have already stated, that growing out of possible collisions of salvage vessels, or the entanglement of the parted hawsers in the machinery of the steamer or tug. It was something, if not much.

4. The value of the property employed in the salvage was, in all, $44,000.—the steamer Planter and her cargo of rice, $30,000, and the tug Brandow, $14,000. The danger to which this property was exposed in the performance of this service we have already sufficiently considered.

5. The skill exhibited was apt, and all that was needful, and commanded prompt and complete success. The steamer Planter, on her way from Georgetown, perceiving that the schooner was aground and in distress, immediately proceeded to her rescue. The tug Brandow, lying at her wharf in Charleston with steam up, observing that, when in company with other vessels, she alone stopped,

took for granted that she had grounded, and without any delay steamed down to relieve her. And the steamer and the tug, arriving at the schooner almost at the same time, joined their forces, and each playing their several and most effective part, by their united effort, with the use of their own and the schooner's hawsers hauled her off from the shoal. They were both necessary to the achievement of success. The steamer applied the power, and the tug, as we have seen, rendered that power most effective, and which alone was sufficient for success.

6. The service of hauling the schooner off the shoal was the real and only substantial service rendered, and occupied about half an hour or so, and the whole service about an hour.

It is stated by the libelants that they accompanied the schooner up to the city. If so, it was in point of fact wholly unnecessary. When extricated from the shoal and once afloat, she was perfectly capable of taking care of herself, and did take care of herself. She sailed up to the city immediately upon getting afloat. Her imprisonment was her only difficulty. Upon this full review of the facts and principles involved in this case, while it cannot be doubted that a meritorious salvage service has been rendered, and all that was done was faithfully done, without imputation of unfairness in any regard, and with such skill and labor as were apt and necessary to the success of the service, it will be admitted that the salvage was not one of high degree. There were wanting, as not needed, some of the elements that most enhance the degree of the salvage, and most contribute to its largest rewards.

In the endeavor to arrive at a sound conclusion, just to both parties, and moderate as to either, always a matter of difficulty, I have taken special advisement from the case of The M. B. Stetson [Case No. 9,363]. That was the case of a brig driven ashore in a gale of wind in the harbor of Boston. She was relieved by one vessel, a powerful tug, valued at $18,000, which "dragged the brig off the shore in 15 or 20 minutes, with some aid from her own crew, who heaved up on the port chain." In this case Judge Lowell, one of the soundest and most discriminating of judges, gave $1,500, nearly 5 per cent. upon the amount saved, and the salvage in that case was almost perfect as to cargo and vessel, and entirely so as to the cargo. It is most material to observe that the cargo of the brig was sugar, and the danger apprehended, as to both cargo and vessel, was damage, and not destruction, and in case the bark had sprung a leak, the damage to the sugar must have been serious. It is also material to observe that the vessel in this case was driven ashore in a gale of wind, and was assisted while the gale was still blowing. And it is pertinent to note that, immediately after the brig was relieved, the gale began to moderate, and before high water it had become comparatively

calm. As in the case at bar, the weather succeeding the salvage was good. And as illustrating the point of danger to the salving vessel, the judge remarks: "Neither was danger to the tug very considerable. There was some danger, undoubtedly arising from the high pressure of steam necessary to be used, and if this strain should break the machinery, there would be great danger, but this was not probable." This special danger, here stated by the judge, is additional to that heretofore stated by me in the course of this opinion, namely, that growing out of the parting of hawsers, and their probable entanglement with the screw of the tug or the wheels of the steamer, and also, when two vessels are employed in the service, as in the case in hand, the quite probable danger of collisions.

After the fullest and most careful consideration of the facts in this case, and in the light of the principles herein set forth, I have reached the conclusion that the respondents, as a moderate and reasonable compensation, shall pay to the libelants the sum of $1,200; and it is so ordered and decreed.